**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KIMBERLY BRADY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 08 C 4216 |
| v. | ) |
| | ) Magistrate Judge Cole |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Kimberly Brady, seeks review of the final decision of the Commissioner

("Commissioner") of the Social Security Administration ("Agency") denying her applications for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C.

§§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. §

1382c(a)(3)(A). Ms. Brady asks the court to reverse and remand the Commissioner's decision, while

the Commissioner seeks an order affirming the decision.

Ms. Brady applied for DIB and SSI on April 7, 2005, alleging that she had been disabled

since May 1, 2003, as a result of "brain tumor/back spasm/neck/depression/headache/dizzy."

(Administrative Record ("R.") 100-02, 185). She is a frequent applier. She applied for disability

benefits in December of 2001, but abandoned her claim. (R. 113). In June 2002, she applied again,

alleging she had been disabled since November of 2001. (R. 112). That claim was denied because

Ms. Brady refused to undergo a consultative medical examination. (R. 112-13). She continued

working as "truss builder" thereafter, standing and walking most of the day and lifting up to 50

pounds. (R. 153-54). She again applied for disability benefits in June of 2002 (R. 113) – while,

according to her own work history report, continuing to work at the truss factory. (R. 153-54). This application was denied for the same reason as the previous one. (R. 112-13). Undaunted, Ms. Brady tried again. In March of 2005, when she was no longer working at the truss factory, she alleged she had been disabled since May 2005. (R. 112-13). This time, the claim was denied because she had the capacity to perform her past work. (R. 112).

Next was her current claim, which was denied initially and upon reconsideration. (R. 61-73). Ms. Brady continued pursuit of his claim by filing a timely request for hearing on July 19, 2004. (R. 65). An administrative law judge ("ALJ") convened a hearing on November 8, 2007. (R. 374-422). Ms. Brady had to testify by video teleconference, as she had been convicted of burglary in late 2006 and was incarcerated at the women's correctional center in Dwight, Illinois. (R. 381-82). She explained that the burglary occurred at the One-Stop Mart where she had been working for a little over two months. That job ended, predictably, when she was terminated as a result. (R. 387). Her attorney also appeared by video teleconference. In addition, a vocational expert, Dennis Gustafson, appeared in person and testified. (R. 413-20). On December 20, 2007, the ALJ issued a decision denying Ms. Brady's application because he found Ms. Brady would be able to perform certain light work that existed in significant numbers in the regional economy. (R. 12-22). This became the final decision of the Commissioner when the Appeals Council denied Ms. Brady's request for review of the decision on May 21, 2008. (R. 4-6). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Brady has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD
### A.
### Vocational Evidence

Ms. Brady was born on October 11, 1976, making her thirty-one years old at the time of the ALJ's decision. (R. 100). She is 5' 11" and weighs 220 pounds. (R. 184). She quit high school in the 11th grade, but did get her GED, which was paid for through public aid. (R. 189, 386). She's had a sporadic history of unskilled work as a waitress, cashier, laborer, and warehouse and factory worker. (R. 154-57, 186).

### B.
### Medical Evidence

On July 24, 2003, Ms. Brady saw Dr. Richard Goldberg, at Leyden Family Services, complaining of depression. (R. 221-22). She explained that she had been in an abusive relationship with her husband of eighteen months and was moving out with her two children from another relationship. She also said she had been diagnosed with a pituitary gland tumor and that had exacerbated her depression. Ms. Brady related her history of being a "cutter" in her youth and receiving psychiatric treatment in adolescence. (R. 221). Dr. Goldberg described her as obese, and observed that she was alert and oriented. She exhibited adequate general knowledge and abstract thinking. Her memory was normal, both recent and remote. Her judgment was fairly good, as was her insight. Ms. Brady's affect, however, was depressed and somewhat tearful. The doctor diagnosed major depression and recurrent adjustment disorder with disturbance of mood . He felt her outside psychological stressors were severe and assigned a Global Assessment of Functioning

score of 45.[1]

Ms. Brady began a course of treatment at the Leyden clinic in March of 2004. That provides the bulk of the medical record: fifty pages of hand-written clinical notes from Ms. Brady's treatment with Dr. Richard Goldberg, although the vast majority of the entries are from a clinician. (R. 243-295). As they are hand-written, some of the jottings are legible, many are not. Dates are highlighted, which, when the reports are copied, results in them being obscured – and the reports do not appear to be in chronological order. Such compendia of observations are undoubtedly valuable to therapists and the psychiatrists they work under but, as is usually the way in these cases, there is very little regarding the ability to work. There are, invariably, complaints about relationships with family members – be they spouses, parents, children or siblings. Therapists counsel the individuals on how to deal with the problems most people face in life; in essence, attempt to impart a little common sense. There are mentions of whether medication is working and being tolerated. But in the main, these types of chronicles – and this case is no exception – alternate from "doing better" to "doing worse." Here, at least, it can be said that the majority of entries on Ms. Brady appear to be of the "doing worse" variety. And common sense in dealing with her situations is not in her arsenal.

For example, in March of 2004, Ms. Brady said that her seven- year- old daughter told her that Ms. Brady's father, with whom they were living after Ms. Brady was estranged from her husband, was touching her inappropriately. Why Ms. Brady would leave her child in the care of a

---

[1] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a "hypothetical continuum." The process is designed to guide clinicians through a methodical and comprehensive consideration of all aspects of a patients symptoms and functioning to determine a patients GAF rating in less than 3 minutes. A score in a range of 41-50 denotes "severe symptoms . . . OR any serious impairment in social, occupational or school functioning." http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

parent whom she claimed molested her when she was a child (R. 300) simply defies comprehension. There was a reference to a criminal arraignment coming up on April 7, 2004; this apparently related to charges against her father. She said she had "shakiness, fast heartbeat, and butterflies in her stomach" and that she was unable to relax. She was angry and sad when she thought about her daughter and also wanted to kill her father, although she knew she never would. (R. 219). Ms. Brady seemed detached when talking about her own abuse as a child, mental illness, and two psychiatric hospitalizations. (R. 220).

In December 2004, Ms. Brady said she always felt angry but did not know why. (R. 262). She continued to be depressed and anxious and continued to be detached when talking about herself and her own experiences. (R. 260-61). Treatment notes in early 2005 reflect that "she has poor insight into her condition" (R. 284) and was using alcohol despite the fact that she got a DUI. (R. 284). Her judgment was impaired and despite her husband's abusiveness, she was tearful and distraught recounting her husband's recent departure from the home (R. 282). Her risky behaviors were discussed (R. 280). At one point she was not regularly attending group meetings and was "stalking" her estranged husband. (R. 270).

There were reports of panic attacks and also of manic behavior in the spring of 2005. (251, 256-257). The counselors identified a borderline personality disorder and a history of histrionic attention seeking. (R. 254). In April 2005, her counselor noted "borderline personality traits, her anger and suspicion and mistrust of people contribute to her inability to get work." (R. 244). On April 7, 2005, she went into the office so the psychologist could help her with her SSI application interview. At the end of the session, she began sobbing that she wanted her alcoholic husband back in her home, but the psychologist told her she had to follow through with treatment guidelines; she

was not complying with treatment and the psychologist explained that this was why she found herself in a perpetual crisis. (R. 246-47). Ms. Brady appeared calm and able to think and process suggestions on April 27, 2005, despite her life being "somewhat chaotic" due to her inability to get work and an unhealthy environment in her home. (R. 244). A day later, her medication was changed from Welbutrol to Lexapro due to side effects: she felt manic and was experiencing numbness in her hands and feet. (R. 244).

On May 5, 2005, Ms. Brady called in and said she felt like she was having a nervous breakdown. Her mind was racing and she felt like she could not go on; she said that her "brain is no good." (R. 245). By May 10th, Ms. Brady reported she was doing "much, much better" on the new medication, Lexapro. (R. 243). On May 12, 2005, she "appeared somewhat better," but was anxious about her disability benefits application and exam; the treating psychologist assured her she was improving. (R. 243). The therapist noted that she seemed better able to communicate, but noted her hand was shaking and Ms. Brady acknowledged anxiety about life in general. (R. 243).

On May 23, 2005, the Agency arranged for Dr. Mahesh Shah to examine Ms. Brady in connection with her application for disability benefits. (R. 296). Ms. Brady said that she had a pituitary gland tumor "many years ago when she was very young," but that it disappeared after a year. (R. 296). She also said she had suffered low back pain for the last three or four years, and had been experiencing headaches and dizziness. (R. 296). The headaches and dizziness were apparently side effects from her depression medication. (R. 296, 299). Examination of Ms. Brady's back was completely normal. (R. 298-99). Noting Ms. Brady's history of depression and her regimen of anti-depressant medication, Dr. Shah recommended a psychological examination. (R. 299).

The next day, Ms. Brady did undergo a psychological evaluation with Dr. John Conran. This

time, Ms. Brady said she had been diagnosed with a brain tumor, which was later found to be a pituitary gland tumor. (R. 300). She related her adolescent psychiatric history, and reported that she had been molested by her father, who also molested her daughter; charges were in progress. (R. 300). Ms. Brady was living in an apartment with her two children. (R. 301). Ms. Brady was groomed appropriately and was able to provide her history reasonably well. (R. 301). Her mood was sad and tearful, and her stream of conversation was at times hesitant. (R. 301). There were no indications of delusions or hallucinations. (R. 301). Immediate recall was fine, but Ms. Brady could recall four of five words after ten minutes. (R.302). She could subtract serial sevens from one hundred. (R. 302). Judgment and insight were somewhat impaired. (R. 302). Dr. Conran's diagnosis was major depression, and he recommended a representative payee if Ms. Brady were awarded benefits. (R. 302).

On June 6, 2005, Dr. Virgilio Pilapil reviewed the medical evidence on behalf of the agency and determined that Ms. Brady had no physical impairments that would prevent her from doing medium work. (R. 304-311). On June 23, 2005, another agency doctor, Dr. Erika Altman, reviewed the medical evidence regarding Ms. Brady's psychological impairment. She determined that Ms. Brady would be moderately limited in her ability to respond appropriately to criticism and accept instructions from supervisors, and get along with peers and coworkers. (R. 313). Dr. Altman also found Ms. Brady had an affective disorder with moderate restrictions of activities of daily living, mild difficulties in maintaining social functioning, and concentration, persistence, or pace, but no episodes of decompensation of extended duration. (R. 316-29).

On September 6, 2005, Ms. Brady's treating psychiatrist, Dr. Goldberg, completed a psychiatric report form at the request of the Agency. (R. 330-333). He said he had treated her once

7

or twice a week between July 2003 and September 2005. (R. 330). The doctor stated that Ms. Brady had "[o]ngoing psychiatric issues with severe depressive symptoms coupled with anxiety resulting in periodic panic attacks; causing disorientation." (R. 330). He noted that there were times she did not get out of bed to perform basic household functions. (R. 330). She was not involved in outside activities and had a very limited social life and social skills. (R. 331). She had little or no contact with her family due to her symptoms. (R. 331). She didn't eat a balanced diet and wasn't attending to basic hygiene. (R. 330). Dr. Goldberg described her mood and affect as "primarily depressed . . ., tearful, labile often inappropriate to context." (R. 331). Her speech was "somewhat irrelevant, but coherent, some loose associations." (R. 331). She could name the last three Presidents and just three large cities. (R. 332). Ms. Brady could not perform serial sevens, and could repeat five umbers forward but only 2 back. (R. 332). Dr. Goldberg's diagnosis was major depression, recurrent (R. 333). The doctor felt she was capable of handling her own funds. (R. 333). As for her ability to work, he opined that:

> Due to her depressive and anxiety ridden symptomotology she often becomes forgetful and disoriented to task at hand. When the symptoms overwhelm her she may become somewhat immobilized to sorting out what the next step is. This impairment is at times significant.

(R. 333).

Two additional agency physicians reviewed the record and concurred in the assessments of Drs. Pilapil and Altman on September 20, 2005. (R. 334-37). On December 1, 2005, yet another agency doctor, Dr. Kirk Boyenga reviewed the record and indicated there was insufficient evidence to reach a conclusion as to whether Ms. Brady had a psychological impairment. (R. 338).[2]

---

[2] The record includes a form sent to agency doctor, Richard Bilinsky, indicating that Ms. Brady's claim was
(continued...)

Dr. Goldberg completed another form in April of 2006. He found Ms. Brady to be moderately limited in the following areas: obedience to work rules, using independent judgment, function without supervision, maintaining attention to details, understanding and carrying out complex or simple job instructions, responding appropriately to job situations with co-workers and supervisors, dealing with changes in a routine work setting, demonstrating reliability, maintaining personal appearance. (R. 287-88). She was markedly limited in her ability: to relate to co-workers, deal with the public, obey supervisors, deal with work stress, perform reliably under stress, behave in a stable manner in stressful situations, relate predictably in social situations. (R. 287-88). The doctor said she was "too labile, paranoid, and [illegible] to function in a work setting." (R. 288). Shortly before that, Dr. Goldberg had made this entry in his notes: "Doing 'alright' on the Lexapro but states she's still depressed. Upset that the SSI form was filled out by myself and that the boxes I checked caused her to lose her $400/month benefits." (R. 290). This may have been the previous form the doctor completed in September 2006, although Ms. Brady's application was denied on reconsideration in December of 2005. (R. 67).

While Ms. Brady was in prison, she saw psychiatrist Dr. Vryer. His initial diagnosis was a depressive disorder with features of anxiety and PTSD. (R. 360). He prescribed Celexa and Geodon. (R. 360). In July 2007, Dr. Vryer described Ms. Brady as having ongoing feelings of anxiousness and alternating weeks of depression and weeks of increased energy. (R. 361). There

[2](...continued)
being denied because she had not completed a 15-year work history report, and instructing the doctor to "check the box below" if he concurred. (R. 353). The form has five boxes below, of which Dr. Bilinsky checked the one stating "[t]hese findings complete the medical portion of the determination." (R. 354). There is no telling what this means, as the failure to complete a work history report has nothing to do with medical evidence or a medical determination.

was increased impulsive behavior, anger and irritability. (R. 361). Dr. Vryer changed the Geodon to Klonopin. (R. 361). In August 2007, Dr. Vryer diagnosed anxiety disorder and felt that both bipolar disorder and panic disorder needed to be ruled out. (R. 362). Dr. Vryer increased the Celexa dosage. (R. 362). The following month, Ms. Brady asked Dr. Vryer for more benzodiazepines – drugs to treat anxiety by producing a calming effect. (R. 363). Dr. Vryer explained the addictive properties of such medication and did not change any of Ms. Brady's prescriptions. (R. 363). Ms. Brady went off medication for five days at one point; she experienced crying, distress, migraines, flashbacks, and nightmares. (R. 364). Dr. Vryer restarted Tegretol and Celexa. (R. 364).

On November 6, 2007, Dr. Vryer completed a mental capacities assessment. (R. 356-357). Dr. Vryer reported markedly limited abilities to: abide by work rules; relate with co-workers; deal with the public; follow the orders of supervisors; and deal with work stresses. (R. 356). He reported moderate limitations in Ms. Brady's abilities to: use independent judgment; function without supervision, and maintain attention to details. (R. 356). Dr. Vryer noted Ms. Brady said she had a history of getting into screaming matches with supervisors. (R. 356). Dr. Vryer felt that Ms. Brady had questionable judgment, difficulty following the rules, and that she related one instance where she threw a pair of scissors at a customer. (R. 356). Dr. Vryer reported that she had markedly limited ability to perform reliably in job situations requiring the use of judgment under stress, or to respond appropriately to normal job situations with co-workers and supervisors. (R. 356). Ms. Brady had moderate limitations in dealing with even simple job instructions (R. 356). She tended to be late, had a low frustration tolerance, and tended to respond to stressful situations with crying. (R. 357). Her behavior in a work setting would be unpredictable. (R. 357). Dr. Vryer diagnosed a panic disorder (treated with an SSRI), PTSD, and noted that her current symptoms were an

improvement from before she began treatment with a mood stabilizer. (R. 357).

## C.

## Administrative Hearing Testimony

### 1.

### Plaintiff's Testimony

The hearing – held in Peoria, Illinois – proceeded with both Ms. Brady and her attorney appearing by video conference. Ms. Brady's attorney was in Chicago; Ms. Brady was to be incarcerated on burglary charges for about three additional months at the time of the hearing. (R. 376, 381). Before prison, she was living in Streator, Illinois, with her children and a boyfriend. (R. 382). Her boyfriend was working, and she was getting about $400 a month in food stamps and was on Medicaid. (R. 384). She was also receiving unemployment benefits, although she could not recall exactly when. (R. 385). While she was in prison, her children were staying with her mother in Joliet, Illinois. (R. 382). The children were eleven and eight years old at the time of the hearing. (R. 384).

She explained that her last job before prison was as a cashier at a gas station, but that it ended after two months "because that's where the burglary occurred," as she put it. (R. 387). Before that, her employment history was a patchwork quilt of short-lived jobs: a food mart, a franchise restaurant as a waitress, a factory job and another waitressing stint at a restaurant in Vandalia, Illinois. (R. 389-90). She said none of these jobs lasted more than six months; either they were temporary jobs or she simply quit. At one job, she said she "walked out with money in my - - "; perhaps another theft, although her testimony was cut off. (R. 389). Ms. Brady said she hadn't worked for more than a week at the prison, but was going to school for small business management. (R. 392). The rest of

the time she watches TV, reads, or does Bible studies. (R. 392). Ms. Brady said she didn't have trouble getting along with her fellow inmates, but they did not care for her. (R. 392).

Before prison, Ms. Brady said, on the one hand, that she got up about 6 a.m. and went to bed at 9 or 10 p.m. when she was working at the gas station. (R. 393). She made breakfast for her children and got them off to school, helped them with homework in the evening. (R. 393). She sometimes cooked dinner, and did laundry, made the beds and changed sheets; her boyfriend also cooked and he did the dishes. (R. 394). Her children did the vacuuming and sweeping. (R. 395). She grocery shopped with her boyfriend, but sometimes she would leave the store and wait in the car because she couldn't stand being around all the people; she panicked. (R. 396). When she wasn't working at the gas station or on her days off, she said she "basically sle[pt]all day . . . basically just layed in bed all day." (R. 394). She "didn't seem to have ambition or energy to do anything." (R. 395). Ms. Brady didn't have much of a social life; she didn't like being around people. (R. 396). She said she didn't get along with her boyfriend, and got along with her children "somewhat." (R. 397).

Nor was driving Ms. Brady's strong suit. She explained that she hasn't had a driver's license since she was eighteen. (R. 398). She got three moving violations in a year and her license was suspended. (R. 398). Then she got caught driving on a suspended license, and her license was revoked. (R. 398). "And while that process was going on, [she] got a DUI." (R. 398). During that time, she was drinking heavily, but she then went through a period where she didn't drink at all. (R. 399). She was drinking heavily again in the spring of 2006 because the man she was with at that time beat her. (R. 399).

At the time of the hearing, Ms. Brady was taking Tegretol as a mood stabilizer, Klonopin

12

–perhaps for panic – Inderal – a hypertension medication, and Apresoline – another hypertension medication. (R. 400). She said the regimen worked to stabilize her moods, but she still had nightmares and tremors in her hands. (R. 401-02). Previously, drugs like Xanax and Topamax worked for her as well. (R. 402). The only side effect she suffered from her medications was drowsiness. (R. 403). Ms. Brady said that in May of 2006, she was staying at an abused women's shelter and threatened to commit suicide. (R. 406). She claimed she was admitted to a mental hospital but escaped. (R. 406). She said she does not think about suicide. (R. 406). She had crying spells daily – she cried once during the hearing. (R. 410). She also had panic attacks, the worst being, understandably, right before she went to prison. (R. 410). She also said that she became withdrawn after she found out her father was molesting her daughter. (R. 411). At that time she would shower only twice a week and didn't want to do anything. (R. 411).

## 2.

### Vocational Expert's Testimony

Dennis Gustafson, the vocational expert (VE), testified that Ms. Brady's past jobs ranged from light to medium in exertion, and unskilled to semi-skilled. (R.414). The ALJ asked Mr. Radke to consider an individual of the same vocational profile as Ms. Brady who was limited to light work that did not involving being around moving machinery or unprotected heights, and was further limited to simple, repetitive tasks; work that did not demand a production rate quota; and work that did not involve more than occasional interaction with co-workers, supervisors, or the public. (R. 415). The VE stated that such an individual could not perform any of Ms. Brady's past work. (R. 415). He further testified that such an individual could perform such jobs as hotel room cleaner or housekeeper/cleaner. There were 16,030 such jobs in the State of Illinois. (R. 416). Another

13

example of a job such an individual could perform would be cleaning office buildings, and there were 11,330 of those jobs in the state. (R. 417). When questioned by Ms. Brady's counsel, the VE allowed that, while simple repetitive jobs were not regarded as stressful, stress was subjective. (R 419). He also conceded that a person who would miss three or four days a month or leave work without notice due to crying spells, over time, would not be capable of holding a job. (R. 420).

## III.

## THE ALJ'S DECISION

The ALJ found that Ms. Brady had worked since her alleged onset date, including working at the gas station – until she robbed it and was sent to prison. (R. 14). But, her earnings did not qualify as substantial gainful activity and the ALJ determined that she had engaged in none since her alleged onset date of May 1, 2003. (R. 14). The ALJ found Ms. Brady to have the following severe combination of impairments: depression, anxiety, possible post traumatic stress disorder, headache, obesity, possible hand tremors. (R. 14). The ALJ next determined Ms. Brady's impairments failed to meet any listing, including listings 11.08 or 11.09 pertaining to her possible hand tremors, and listings 12.04 and 12.06, pertaining to affective disorders and anxiety disorders, respectively. (R. 15-16). The ALJ recounted the psychological evidence – consultative examination and her two treating psychologists' reports – and Ms. Brady's own testimony as to her daily activities. More specifically, he stated that, based on the notes of her prison psychiatrist, Ms. Brady did well as long as she stayed on her medication. (R. 17). As for her treating psychiatrist, the ALJ noted that he found her to have marked limitations in more than one area of functioning, but that these were based on Ms. Brady's relation of her history as opposed to objective observations by the psychiatrist. ((R. 17). In the end, the ALJ found that Ms. Brady had moderate limitations in the areas of activities of

daily living, social functioning, and concentration. He felt she had no episodes of decompensation. As a result she failed to meet the "B" criteria of the psychological impairment listing, which require marked limitations in at least one of functioning or repeated episodes of decompensation for extended periods. (R. 17). Ms. Brady also failed to meet the "C" criteria, which require repeated episodes of decompensation, a residual disease that would cause the individual to decompensate in the face of even a minimal increase of mental demands or change in environment, or a one-year history of complete inability to function outside a highly supportive environment. (R. 17).

After recounting the medical evidence, including treatment notes and psychological evaluations, the ALJ determined that Ms. Brady retained the capacity to perform light work, with the exception of jobs requiring working around heavy machinery or unprotected heights, due to her allegations of hand tremors or seizure. (R. 18). Her mental impairment further limited her to simple, repetitive non-production quota based tasks that required only occasional interaction with the public, coworkers, or supervisors. (R. 18). The ALJ found that Ms. Brady's allegations about her limitations were not entirely credible, at least not in terms of persistence of her symptoms and the degree of their limiting effects. (R. 19). He noted that she had worked – albeit sporadically – since the date she claimed she had become disabled. (R. 19). When she stopped working, it was not for reasons related to her mental impairment. (R. 20). He also referenced her testimony as to her daily activities and attending business management classes and Bible studies. (R. 20). The ALJ felt such activities did not correlate with allegations of total disability, as they demonstrated an ability to concentrate, pay attention, and maintain pace. (R. 20). He also stated that Ms. Brady's complaints about hand tremors were not credible because she had not sought treatment for them; yet, the ALJ made it part of his residual functional capacity determination. (R. 20). Medication appeared to be

15

successfully controlling her symptoms. (R. 20).

The ALJ went on to discuss the opinions of Ms. Brady's treating psychiatrists. He stated that it appeared that they relied heavily on Ms. Brady's own report her limitations, and accepted this uncritically. (R. 20). The ALJ said the course of treatment was not consistent with the marked limitations found by the psychiatrists. (R. 20). He found that, in any event, the statements of the psychiatrists did not depart substantially from the limitation he included in his residual functional capacity assessment. (R. 20). The ALJ concluded by stating that the psychiatrists' opinions were inconsistent with the longitudinal record as a whole and with Ms. Brady's own statements as to her activities. (R. 20).

Based on Ms. Brady's residual functional capacity, as well as her age, education and work experience, the ALJ noted that if the Medical-Vocational Guidelines were used as a framework, a finding of not disabled would be indicated. (R. 21). But the ALJ instead relied upon the testimony of the vocational expert, who stated that there were some 16,000 maid/housekeeping jobs and 11,000 building cleaner jobs that an individual with Ms. Brady's limitations could perform. (R. 21). Accordingly, the ALJ concluded that Ms. Brady was not disabled and not entitled to disability benefits. (R. 22).

### IV.
### DISCUSSION
#### A.
#### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a

conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, it is not abject, *Parker v. Astrue*, __F.3d__, 2010 WL 851412 at *1 (7th Cir. 2010), and the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544, but that's not always the case in practice. This is borne out by the fact that there are more than a few reversals of district court opinions wherein district court judges found ALJ's reasoning adequately articulated to allow

meaningful review, but the Court of Appeals disagreed. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678

(7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *Stewart v. Astrue*, 561 F.3d 679

(7th Cir. 2009); *Villano v. Astrue*, 556 F.3d at 558 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-

78 (7th Cir. 2008); *Getch v. Astrue*, 539 F.3d 473, 481-82 (7th Cir. 2008); *Giles ex rel. Giles v. Astrue*,

483 F.3d 483, 487 (7th Cir. 2007); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007); *Ribaudo v.

Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004);

*Golembiewski v. Barnhart*, 322 F.3d 912, 914-15 (7th Cir. 2003).

## B.

## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether

a plaintiff is disabled:

> 1) is the plaintiff currently unemployed;

> 2) does the plaintiff have a severe impairment;

> 3) does the plaintiff have an impairment that meets or equals one of the impairments
> listed as disabling in the Commissioner's regulations;

> 4) is the plaintiff unable to perform his past relevant work; and

> 5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel.

Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the

next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920;

*Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any

point, other than step 3, stops the inquiry and leads to a determination that the claimant is not

disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof

through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d

at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Ms. Brady argues that the ALJ's assessment of her mental capabilities is erroneous and

ignored evidence, and that his credibility finding is fundamentally flawed. She contends that the ALJ

wrongly discounted reports from her psychiatrists because he found them inconsistent with the

longitudinal record and her own testimony, and because they uncritically accepted her complaints.

She faults the ALJ for focusing on isolated comments in the clinical notes in which she was noted

to be "doing well" or "better."

There is much about Ms. Brady's story that is questionable, and details of her story call into

question her credibility, not the least of which is her conviction apparently for robbery or theft. *See*

Rule 609, Federal Rules of Evidence. The problem is that certain aspects of this evidence were not

relied on by the ALJ in concluding that Ms. Brady was not a credible witness and if she was not

credible her renditions to her doctors may be highly suspect. While a case can certainly be made that

the ALJ's ultimate conclusion was correct, that is not the job of a reviewing court. Those are

determinations to be made in the first instance by the ALJ based upon those aspects of the evidence

he deems relevant and which support his conclusion. And while there may be few, if any, employers

who would want Ms. Brady as an employee, that's not the same as being disabled. *Bauer v. Astrue*,

532 F.3d 606, 609 (7th Cir. 2008)(". . . the fact that employers prefer other people, and so won't hire

her, does not entitle her to benefits."); *Henderson v. Barnhart*, 349 F.3d 434, 436 (7th Cir. 2003).

19

In finding that Ms. Brady could be a motel maid or clean offices, the ALJ rejected the opinions of her treating psychiatrists who felt she was unable to work. The opinion of a treating physician is entitled to controlling weight if well supported by objective findings and not inconsistent with other substantial evidence in the record. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007). If an ALJ is not going to give a treating physician's opinion controlling weight, he must give "good reasons" for explaining how much weight he has given the opinion. 20 C.F.R. § 404.1527(d)(2). And here, there were two treating psychiatrists, and they both examined Ms. Brady over an extended period of time; meaning that, the ALJ must give great weight to their evidence unless it was seriously flawed. *Bauer v. Astrue,* 532 F.3d 606, 608 (7th Cir. 2008).

The ALJ said he had two reasons to discount those opinions. One reason was because he felt those assessments were inconsistent with various clinical notes indicating that Ms. Brady was "doing better" on this medication or that. When a treating doctor's assessment conflicts with his own treatment notes, that's a valid reason for an ALJ to disregard his or her opinion. *Skrabek v. Barnhardt,* 350 F.3d at 500, 503-04 (7th Cir. 2004). But in a case such as this, ALJs must tread lightly, and not place too much stock in the odd jotting indicating a patient is "doing better." The Seventh Circuit has pointed out the flaw in this type of reasoning, at least in the context of bipolar disorder. In *Kangail v. Barnhart,* 454 F.3d 627 (7th Cir. 2006), the claimant suffered from bipolar disorder and was a substance abuser. Judge Posner took issue with the ALJ's focus on what the claimant's therapists had jotted down during her sessions:

> He thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.

454 F.3d at 629. The Commissioner's own regulations acknowledge the cyclical nature of such impairments. In the case of mental disorders, the regulations state a clear preference for "longitudinal evidence":

> Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(2).

More recently, in another case involving a bipolar claimant, Judge Posner had this to say about another ALJ reading too much into treatment notes:

> What seems to have made the biggest impression on the administrative law judge, but suggests a lack of understanding of bipolar disorder, was that [the treating psychiatrist's] treatment notes, which back up the report in which she concludes that the plaintiff cannot work full time, contain a number of hopeful remarks. They are either remarks the plaintiff made to [the doctor] during office visits or [the doctor's] independent observations – the plaintiff's memory was "ok," her sleep fair, she was doing "fairly well," her "reported level of function was found to have improved," she had "a brighter affect and increased energy," she "was doing quite well." On the basis of such remarks the administrative law judge concluded: "little weight is given the assessment of [the treating psychiatrist]."

*Bauer*, 532 F.3d at 609.

The court explained that a person with a chronic disease, whether physical or psychiatric and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days. That does not mean they can hold down a full-time job. 532 F.3d at 609. Ms. Brady may not be bipolar, but she has a chronic mental illness, as the ALJ recognized. (R. 26). At any given point in her treatment, she was on a number of medications. Like the claimant in *Bauer*, then, Ms. Brady can be expected to have days where she is managing better or feeling less depressed than she is on other

days. The question is the consistency of her statements that she is doing better and whether there appears to be a genuine upward trajectory.

Here, it appears that for every "doing better on . . ." there are numerous negative comments about her poor insight, impaired judgment, always feeling angry, engaging in risky behavior, panic attacks, manic behavior, having a nervous breakdown, feeling like she can't go on. So assessments like "doing better" are not only isolated, they are relative to the patient's condition. As was the case in *Kangail* and *Bauer*, the ALJ put too much stock in isolated, albeit positive, comments in progress notes. Even from a general perspective and ignoring the nature of the malady, long before *Kangail* and *Bauer*, it was well-settled that an ALJ could not pick and choose among the evidence, selecting only those pieces that favor his ultimate conclusion. *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir. 1984); *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ did that here and employed that evidence to disregard the opinions of Ms. Brady's treating physicians. Those clinical notes do not provide an adequate basis to have done so.

The ALJ's other reason for rejecting those opinions was because he concluded that the doctors were merely accepting what Ms. Brady was telling them. "[M]edical opinions upon which an ALJ should rely need to be based upon objective observations and not amount merely to a recitation of a claimant's subjective complaints." *Rice v. Barnhart,* 384 F.3d 363, 370-71 (7th Cir.2004); *see also White v. Barnhart,* 415 F.3d 654, 659 (7th Cir.2005). Suppose a doctor says his or her patient can't work because of a back impairment, but MRIs and x-rays are normal, as are range of motion studies. Instead, his opinion of what his patient can and cannot do is drawn entirely from the patient's complaints. That is the type of situation where an ALJ might properly reject a treating physician's opinion. *See, e.g., Skrabek,* 390 F.3d at 503-04.

22

That is not the situation here. There are no MRIs or x-rays for evaluation of psychological problems. Any medical diagnosis necessarily must rely upon a patient's history and subjective complaints to some degree, *see Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir.1997), and with psychiatric patients to a large degree. Psychiatrists don't monitor their patient's behavior and have no source of information beyond the patient's statements and affect. They listen to their patients' complaints and stories and determine what is significant and what isn't, what is true and what is exaggeration. It's not as if Ms. Brady said she was too depressed and anxious to work and her psychiatrists simply took her at her word.

Dr. Goldberg treated Ms. Brady for a number of years on a regular basis, working with a therapist. Dr. Vryer saw her fairly regularly during the year she was in prison. Both psychiatrists came to similar conclusions about Ms. Brady's limitations and her inability to function in a work setting. And there is not really anything in the record that would lead one to believe that they simply parroted Ms. Brady's allegations; between her robbing her employer – or employers – and her dangerous parenting decisions and hoping to reunite with her abusive husband, there is plenty to support their assessments aside from Ms. Brady telling them she can't deal with stress or other people or a significant portion of ordinary, daily life. Accordingly, the dual rationale the ALJ provided for discounting the opinions of treating doctors here does not withstand scrutiny.

That is enough to require a remand in this case. But the ALJ also made a questionable credibility finding. He found that allegations that her mental illness limited her to a disabling degree were not credible when compared to her daily activities. He focused on her sporadic and short-lived jobs, noting that she didn't indicate she ever left a job due to her disability, and said that was evidence that she could have continued working despite her impairments. And he cited her ability

to do some housework (her children did vacuuming and mopping, and she only cooked "sometimes"), taking a business class in prison (there is nothing to suggest how often the class met or if she attended religiously), watching televison, and reading the Bible. But these few activities do not equate with the ability to hold down a forty-hour-a -week job, and the Seventh Circuit has consistently cautioned ALJs against putting too much stock in reading, watching television, and doing a little house work. *See Parker v. Astrue,* 2010 WL 851412, 2 (7th Cir.2010); *Bauer, supra; Moss v. Astrue,* 555 F.3d 556, 562 (7th Cir. 2009); *Craft v. Astrue,* 539 F.3d 669, 680 (7th Cir. 2008); *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir.2006). "The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work." *Mendez v. Barnhart,* 439 F.3d 360, 362 (7th Cir. 2006). And limited household activities should not outweigh the opinions of two treating psychiatrists who say Ms. Brady cannot hold down a job. *Bauer,* 532 F.3d at 608-09.

True, the ALJ did not rely exclusively on Bible reading and occasional cooking to find Ms. Brady not credible; he pointed out that she was able to work for various brief periods. But her history of not being able to last more than several weeks in any job tends to support her claims rather than undermine them. *Cf. Kangail,* 454 F.3d at 630 (cautioning against placing too much weight on jobs held briefly and sporadically). The ALJ said that whenever she stopped working, it was for reasons unrelated to her allegedly disabling impairments. But aside from finding out that her most recent job ended when she robbed the gas station she worked at, he never asked her why she left any of her jobs. So there is no way to say whether her mental illness caused her to be unable to hold onto any job she's ever had. As such, his basis for finding Ms. Brady not credible has no support in the

record. Like the treatment of the psychiatric opinions in this case, this, too requires a remand.

## CONCLUSION

The plaintiff's motion for reversal and remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED. This matter is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTERED:_____

UNITED STATES MAGISTRATE JUDGE

DATE: 3/16/2010